*Decisions will be entered under Rule 50.*

MID-SOUTHERN FOUNDATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 57866. Filed July 29, 1957.

*John R. Stivers, Esq.*, for the petitioner.
*Herman Wolff, Jr., Esq.*, for the respondent.

BRUCE, *Judge:* Respondent determined the liability of petitioner as transferee for the deficiencies in the income tax of Madison Avenue Corporation, transferor, in the following amounts:

| Year | Deficiency in income tax |
|---|---|
| 1950 | $8, 176. 74 |
| 1951 | 21, 160. 18 |
| 1952 [1] | 404. 99 |

[1] January 1 to June 10.

In the petition filed herein, petitioner claimed that the transferor overpaid its taxes in 1950 and 1951 in the amounts of $7,342.63 and $9,881.81, respectively.

Petitioner concedes its liability as transferee and has abandoned its claim that the statute of limitations barred the imposition of transferee liability. The issues presented concern the liability of the transferor and are as follows:

(1) Whether, in the computation of the excess profits tax credit for the year 1951, and the period January 1 to June 10, 1952, inclusive, the excess of liabilities over assets at the beginning of each such year results in a "negative" equity capital amount less than zero for the purpose of computing the taxable year capital reduction.

(2) Whether, in the computation of the excess profits tax credit for the year 1950, the distributions not out of earnings and profits of such year must be reduced by the 1950 corporate earnings allocable to certain shares of stock retired by Madison Avenue Corporation in that year and limited to the amount of the equity capital at the beginning of such year.

(3) Whether, in the computation of the excess profits tax credit for 1950, 1951, and the period January 1 to June 10, 1952, inclusive, the transferor is entitled to an adjustment for base period losses from operating a farm as a branch.

(4) Whether certain rents and expenses incurred by the transferor during the base period constitute abnormal expenditures to such an extent as to permit adjustment of excess profits credits for the taxable years 1950 and 1951.

## FINDINGS OF FACT.

Most of the facts have been stipulated and are so found.

The Madison Avenue Corporation was incorporated in September 1932, under the laws of the State of Tennessee. Its principal business activity was that of a real estate operator engaged in the management and leasing of office space and its principal asset was the Sterick Building in Memphis, Tennessee. Madison Avenue Corporation filed corporation income tax returns for 1950, 1951, and the period commencing January 1 and ending June 10, 1952, with the collector of internal revenue for the district of Tennessee.

The petitioner, Mid-Southern Foundation, is a corporate entity organized pursuant to the provision of section 4146 of the 1932 Code of Tennessee providing for the organization of corporations for the general welfare and not for profit. On June 9, 1952, at the first meeting of its incorporators petitioner's officers and trustees voted to acquire all the outstanding stock of Madison Avenue Corporation. Petitioner became the owner of all of Madison Avenue Corporation's capital stock and all the assets of the Madison Avenue Corporation were transferred to and all the liabilities of such corporation were assumed by petitioner on June 10, 1952. The corporate charter of the Madison Avenue Corporation was surrendered on June 10, 1952, and recorded in the office of the secretary of state of the State of Tennessee on June 11, 1952.

The closing balance sheet of Madison Avenue Corporation on June 10, 1952, was as follows:

| Assets | | Liabilities | |
|---|---|---|---|
| Cash on hand | $24,674.86 | Bad debt reserve | $2,299.28 |
| Accounts receivable | 21,625.40 | Accounts payable | 58,277.81 |
| Alteration in progress | 3,947.75 | Notes payable | 19,522.74 |
| Miscellaneous accounts receivable | 405.66 | Accrual interest | 22,762.68 |
| Claim for refund (Federal taxes) | 10,313.56 | Accrued salaries and wages | 2,612.69 |
| Stock in Monroe and Second Corporation | 1,000.00 | Payroll taxes | 2,257.21 |
| Advancements to Monroe and Second Corporation | 16,990.32 | Accrued ad valorem taxes | 15,557.32 |
| Loans receivable (H. T. and G. P. Slater) | 6,500.00 | Reserve for bonuses | 2,100.89 |
| Membership in University Club | 684.00 | Reserve for depreciation | 1,281,525.42 |
| | | Reserve for Federal income taxes | 75,977.89 |
| | | Due to officers and employees | 35,232.87 |
| | | Notes payable (Jeff. Std. Ins.) | 1,260,000.00 |

| Assets | | Liabilities | |
|---|---|---|---|
| Depreciable assets (Sterick Building) | $4,590,676.98 | Stock purchase contract | $250,000.00 |
| Furniture and fixtures | 17,258.76 | Notes payable—Gilliland Farms | 254,700.38 |
| Miscellaneous equipment | 9,509.75 | Construction allowance—Walgreen | 2,166.78 |
| Lounge room furniture | 553.52 | Unearned rents | 34,274.10 |
| Tenants' air conditioning | 13,156.33 | Capital stock | 27,358.67 |
| Cash value life insurance | 19,068.38 | Unrealized surplus appreciation | 135,367.98 |
| Prepaid interest | 232.55 | Revaluation surplus | 2,558,386.75 |
| Prepaid insurance | 7,088.04 | Accumulated deficit | (1,294,183.32) |
| Prepaid rent | 1,000.00 | | |
| Due from officers and employees | 1,512.28 | | 4,746,198.14 |
| | 4,746,198.14 | | |

Petitioner's opening balance sheet on June 10, 1952, was as follows:

| Assets | | Liabilities | |
|---|---|---|---|
| Cash on hand | $24,674.86 | Notes payable—Gilliland stock | $2,047,500.00 |
| Accounts receivable | 21,625.40 | Bad debt reserve | 2,299.28 |
| Alteration in progress | 3,947.75 | Accounts payable | 58,277.81 |
| Miscellaneous accounts receivable | 405.66 | Notes payable | 19,522.74 |
| Claim for refund (Federal taxes) | 10,313.56 | Accrued interest | 22,762.68 |
| Stock in Monroe and Second Corporation | 1,000.00 | Accrued salaries and wages | 2,612.69 |
| Advancements to Monroe and Second Corporation | 16,990.32 | Payroll taxes | 2,257.21 |
| Loans receivable (H. T. and G. P. Slater) | 6,500.00 | Accrued ad valorem taxes | 15,557.32 |
| Membership in University Club | 684.00 | Reserve for bonuses | 2,100.89 |
| Depreciable assets (Sterick Building) | 4,015,221.15 | Reserve for depreciation | ———— |
| Furniture and fixtures | 19,177.58 | Reserve for Federal income taxes | 75,977.89 |
| Miscellaneous equipment | ———— | Due to officers and employees | 35,232.87 |
| Lounge room furniture | ———— | Notes payable (Jeff. Std. Ins.) | 1,260,000.00 |
| Tenants' air conditioning | ———— | Stock purchase contract | 250,000.00 |
| Cash value life insurance | 19,068.38 | Notes payable—Gilliland Farms | 254,700.38 |
| Prepaid interest | 232.55 | Construction allowance—Walgreen | 2,166.78 |
| Prepaid insurance | 7,088.04 | Unearned rents | 34,274.10 |
| Prepaid rent | 1,000.00 | Capital stock | ———— |
| Due from officers and employees | 1,512.28 | Unrealized surplus appreciation | ———— |
| | 4,149,441.53 | Revaluation surplus | 64,198.89 |
| | | Accumulated deficit | ———— |
| | | | 4,149,441.53 |

The fair market value of the Sterick Building on December 31, 1951, and on June 12, 1952, was $4,000,000.

At the beginning of the taxable years 1950 and 1951 and the taxable period January 1 to June 10, 1952, total assets and total liabilities of Madison Avenue Corporation for the purpose of computing the excess profits tax credit were in the following amounts:

|  | 1950 | 1951 | 1952 [1] |
|---|---|---|---|
| Total assets | $1,360,950.19 | $1,377,115.65 | $981,092.56 |
| Total liabilities | 1,143,421.14 | 2,572,500.55 | 2,123,406.73 |

[1] January 1 to June 10.

The amount of borrowed capital for the purpose of computing the excess profits tax credit of Madison Avenue Corporation at the beginning of the taxable year 1950 was $1,041,000. The average daily borrowed capital of Madison Avenue Corporation for the purpose of computing the excess profits tax credit for the taxable years was as follows:

| Year | Amount |
|---|---|
| 1950 | $1,845,743.84 |
| 1951 | 2,017,899.03 |
| 1952 [1] | 1,915,859.03 |

[1] January 1 to June 10.

For the taxable year 1950, the net income of Madison Avenue Corporation for the purpose of computing the normal and surtax and for the purpose of computing the excess profits tax credit was in the amount of $159,423.16. For the taxable year 1951 the net income of Madison Avenue Corporation for the purpose of computing normal and surtax was in the amount of $147,217.39, and for the taxable period January 1 to June 10, 1952, the corporation's net income for the purpose of computing normal and surtax was in the amount of ($391.95).

At the end of the period January 1 to June 10, 1952, total assets of Madison Avenue Corporation for the purpose of computing the excess profits tax credit were in the amount of $893,673.13.

For the purpose of computing the excess profits tax credit under the "income method" the total normal tax net income of Madison Avenue Corporation for the 3 highest base period years, 1947 through 1949, was $233,386.13.

The total dividends received credit to be added back to the total normal tax net income of Madison Avenue Corporation for the 3 highest base period years for the purpose of computing the excess profits tax credit under the income method is $1,156.

The total amount of dividends received to be deducted from the total normal tax net income for the 3 highest base period years of Madison Avenue Corporation for the purpose of computing the excess profits tax credit under the income method is $1,360.

The excess profits net income computed under the income method of Madison Avenue Corporation for the taxable year 1950 is $175,896.79.

The excess profits net income computed under the income method of Madison Avenue Corporation for the taxable year 1951 is $179,953.57.

The excess profits net income prior to annualization computed under the income method of Madison Avenue Corporation for the taxable period January 1 to June 10, 1952, is $12,415.53.

For each of the taxable periods involved, the average daily amount of inadmissible assets of Madison Avenue Corporation was as follows·

| Year | Amount |
|------|--------|
| 1950 | $224,000.12 |
| 1951 | 3,374.57 |
| 1952 [1] | 2,000.52 |

[1] January 1 to June 10.

The total inadmissible assets of Madison Avenue Corporation at December 31, 1949, was $224,000.12.

On June 7, 1950, Madison Avenue Corporation acquired 4,725 shares of its own common stock for $1,500,000. This stock was retired by the corporation on the same date. In computing the excess profits tax credit of Madison Avenue Corporation for the taxable year 1950, the cost of this stock is treated as a distribution made during the taxable year for the purpose of determining distributions during the taxable year not out of earnings.

Madison Avenue Corporation operated a farm for 5 months in 1946, 11 months in 1949, and for the full year in 1947 and 1948. The farm was sold in November 1949. An executive of the corporation whose annual salary was $18,000 provided all of the supervision that the farm received. Two other executives earning $12,000 and $6,000 per year, respectively, did not supervise farm operations at all. No records were kept as to the amount of time attributable to executive supervision of the farm. The office manager and the secretary of Madison Avenue Corporation, who were paid $300 per month and $200 per month, respectively, kept all of the records and performed all of the clerical work relating to the farm. An assistant manager who received $625 per month did not perform any duties relating to the farm. The books relating to farm operations were not kept separately but were incorporated in the regular books of Madison Avenue Corporation. On the books of Madison Avenue Corporation, all management expenses were charged directly to officers' salaries; no portion of such salaries was specifically allocated to farm operation.

The amounts of Madison Avenue Corporation's farm loss, as adjusted by the revenue agent's reports, and as increased by the amount of executive supervision expense and office expense allocable to farm operations, and net farm loss for the purpose of computing base period losses from branch operations were as follows:

| | 1946 | 1947 | 1948 | 1949 |
|---|---|---|---|---|
| Farm loss per books and returns | $5,212.40 | $13,897.35 | $21,618.17 | $24,606.27 |
| Adjustments per R. A. R. dated 4-6-48 | (5,212.40) | | | |
| Adjustments per R. A. R. dated 11-29-48 | 2,141.91 | | | |
| Adjustments per R. A. R. dated 6-21-49 | | (7,317.67) | | |
| Further adjustments: | | | | |
| Supervisory expense at $150 per month | 750.00 | 1,800.00 | 1,800.00 | 1,650.00 |
| Office salaries and expense at $60 per month | 300.00 | 720.00 | 720.00 | 660.00 |
| Net farm loss | 3,191.91 | 9,099.68 | 24,138.17 | 26,916.27 |
| Total net farm loss | | | | 63,346.03 |

The amount of Madison Avenue Corporation's investment in the farm during the base period years was as follows:

1946 _____ $65,990.00
1947 _____ 87,929.81
1948 _____ 102,408.92
1949 _____ 150,675.89

On December 31, 1950, Madison Avenue Corporation's investment in the Sterick Building and other depreciable assets totaled $1,449,608.79.

Madison Avenue Corporation's excess profits net income and aggregate base period net income for the purpose of computing base period losses from branch operations were as follows:

1946 _____ $57,597.56
1947 _____ 113,883.92
1948 _____ 111,952.30
1949 _____ 137,456.83

420,890.61
Add total farm loss_____ 63,346.03

Aggregate base period net income_____ 484,236.64

The total abnormal expenses consisting of alterations, repairs, audit and legal expenses, and loss on oil venture, to be disallowed in the 3 highest base period years of Madison Avenue Corporation were as follows:

For the taxable year ended Dec. 31, 1950_____ $130,110.92
For the taxable year ended Dec. 31, 1951_____ 130,886.02
For the taxable period ended June 10, 1952_____ 86,184.80

By agreement dated January 21, 1954, petitioner, in consideration of respondent's not issuing a notice of deficiency to, and making an assessment against, Madison Avenue Corporation, assumed and agreed, as transferee of the assets of Madison Avenue Corporation, to pay the amount of taxes finally determined or adjudged as due and payable by the Madison Avenue Corporation for the taxable year ended December 31, 1950. On January 21, 1954, petitioner executed a consent fixing the period of limitations which provided that any taxes due from petitioner for the taxable year ended December 31, 1950, could be assessed at any time on or before June 30, 1955. A

statutory notice of deficiency for the years 1950, 1951, and 1952 has never been issued against the Madison Avenue Corporation. Respondent issued the notice of deficiency against petitioner on February 24, 1955.

Madison Avenue Corporation's excess profits credit for the taxable years, as determined by respondent, is as follows:

| Year | Excess profits credit |
|---|---|
| 1950 | $73, 277. 78 |
| 1951 | [2] 25, 000. 00 |
| 1952 [1] | [2] 25, 000. 00 |

[1] January 1 to June 10.
[2] Minimum allowance.

Madison Avenue Corporation had adopted the invested capital method of computing its excess profits tax credit. Respondent computed the excess profits credit on the basis of the income method.

OPINION.

This case arises under the provisions of the Excess Profits Tax Act of 1950, made effective with respect to taxable years ending after June 30, 1950, which added subchapter D (sections 430 to 472, inclusive) to the Internal Revenue Code of 1939, and amendments thereto. The issues presented relate to the computation of the excess profits tax credit allowable to the Madison Avenue Corporation, petitioner's transferor, for the taxable years 1950 and 1951 and the period January 1 to June 10, 1952, inclusive.

Under section 434 (a) the excess profits credit for each applicable year is an amount computed under section 435 (the credit based upon base period income) or section 436 (the credit based upon invested capital) whichever results in the lesser tax for such year. In his determination of the deficiencies herein, respondent adopted the income method, and, in presenting its case, petitioner has adhered to this method.

Section 435 (a) (1), prior to amendment,[1] provided that the excess profits credit for any taxable year should be the sum of 85 per cent

[1] SEC. 435. EXCESS PROFITS CREDIT—BASED ON INCOME.
(a) AMOUNT OF EXCESS PROFITS CREDIT.—The excess profits credit for any taxable year, computed under this section, shall be—
(1) DOMESTIC CORPORATIONS.—In the case of a domestic corporation the sum of—
(A) 85 per centum of the average base period net income,
(B) if the average base period net income of the taxpayer is the amount determined under subsection (d) of this section or under section 442, 12 per centum of the amount of the base period capital addition, computed under subsection (f), and
(C) 12 per centum of the net capital addition (as defined in subsection (g) (1)) for the taxable year,
minus 12 per centum of the net capital reduction (as defined in subsection (g) (2)) for the taxable year.
Section 602 of the Revenue Act of 1951 amended section 435 (a) (1) so as to provide that in the case of taxable years ending after June 30, 1951, the figure "85" in clause (A) should be "83," except in the case of the calendar year 1951, as to which it should be "84." It might here be noted that respondent's determination takes into account the different percentages for the three periods involved herein.

of the average base period net income, 12 per cent of the amount of the base period capital addition computed under subsection (f), and 12 per cent of the net capital addition (as defined in subsection (g) (1)) for the taxable year, minus 12 per cent of the net capital reduction (as defined in subsection (g) (2)) for the taxable year. The net capital addition or reduction for the taxable year is required to be computed on a daily basis in order to determine the exact effect of capital fluctuations on the excess profits credit for the particular year. Sec. 435 (g) (1) and (2).

In computing daily capital addition or reduction, it is necessary to determine, *inter alia*, the amount, if any, by which the equity capital (as defined in section 435 (c)) of the taxpayer at the beginning of the taxable year exceeds, or is less than, its equity capital at the beginning of its first taxable year. Sec. 435 (g) (3) and (4). Equity capital of the taxpayer as of any time is defined as the total of its assets held at such time in good faith for the purposes of the business, reduced by the total of its liabilities at such time. Sec. 437 (c).

The first and principal issue is whether the equity capital of Madison Avenue Corporation at the beginning of the taxable year 1951 and the taxable period January 1 to June 10, 1952, may be an amount less than zero for the purpose of computing daily capital reduction for those years. Sec. 435 (g) (4). The total assets and total liabilities of the Madison Avenue Corporation at the beginning of each taxable period have been stipulated, and both parties agree that Madison Avenue Corporation's equity capital at the beginning of its first excess profits tax year (the taxable year ended December 31, 1950) was $217,529.05. In computing daily capital reduction for 1951 and 1952, however, petitioner and respondent arrive at different results. Petitioner contends that since total liabilities exceeded total assets at the beginning of both taxable years, equity capital of Madison Avenue Corporation can be no less than zero at the beginning of those years and that daily capital reduction was as follows:

TAXABLE YEAR ENDED DECEMBER 31, 1951

| | |
|---|---:|
| Total assets at beginning of taxable year | $1,377,115.65 |
| Deduct, total liabilities at beginning of year | 2,572,500.55 |
| Equity capital at beginning of taxable year | |
| Deduct, equity capital at Dec. 31, 1949 | 217,529.05 |
| Average daily capital reduction | 217,529.05 |

TAXABLE YEAR ENDED JUNE 10, 1952

| | |
|---|---:|
| Total assets at beginning of taxable year | $981,092.56 |
| Deduct, total liabilities at beginning of year | 2,123,406.73 |
| Equity capital at beginning of taxable year | |
| Deduct, equity capital at Dec. 31, 1949 | 217,529.05 |
| Average daily capital reduction | 217,529.05 |

Respondent, on the other hand, insists that equity capital was a negative amount less than zero at the beginning of the taxable years and has computed the daily capital reduction of Madison Avenue Corporation for the same periods as follows:

TAXABLE YEAR ENDED DECEMBER 31, 1951

| | |
|---|---|
| Total assets at beginning of taxable year | $1, 377, 115. 65 |
| Deduct, total liabilities at beginning of year | 2, 572, 500. 55 |
| Equity capital at beginning of taxable year | (1, 195, 384. 90) |
| Deduct, equity capital at Dec. 31, 1949 | . 217, 529. 05 |
| Average daily capital reduction | 1, 412, 913. 95 |

TAXABLE YEAR ENDED JUNE 10, 1952

| | |
|---|---|
| Total assets at beginning of taxable year | $981, 092. 56 |
| Deduct, total liabilities at beginning of year | 2, 123, 406. 73 |
| Equity capital at beginning of taxable year | (1, 142, 314. 17) |
| Deduct, equity capital at Dec. 31, 1949 | 217, 529. 05 |
| Average daily capital reduction | 1, 359, 843. 22 |

In our opinion, petitioner's argument cannot be sustained. Under the definition contained in section 437 (c), the equity capital of a taxpayer is "the total of its assets held at such time in good faith for the purpose of the business, reduced by the total of its liabilities at such time * * *." This, obviously, can result in a minus quantity. Regulations 130, section 40.437–5 (a), provides that "[t]he determination of the equity capital under section 437 (c) shall be made generally in accordance with sound accounting principles, and shall be consistent with the proper method of accounting used in determining the taxpayer's net income and with the rules applicable in determining the earnings and profits of the taxpayer." Petitioner has not shown that respondent's determination of equity capital was not in accord with sound accounting principles or that it was not consistent with the proper method of accounting used in determining petitioner's net income. Nowhere in the record does it appear that respondent's determination of equity capital resulted in an incorrect reflection of petitioner's capital reduction for the taxable year.

Section 435 clearly states that the sum of the components making up the excess profits credit shall be reduced by 12 per cent of the net capital reduction for the taxable year. Congress contemplated that the full amount of capital reductions should be taken into the computation of the excess profits credit, as indicated by the committee reports:

Reductions in invested capital in the tax period under the bill are permitted to decrease prior additions in the tax period at the same rate at which these

increases were previously made in the case of either the average earnings taxpayer or invested capital taxpayer. * * * [H. Rept. No. 3142, 81st Cong., 2d Sess., p. 11.]

Any reductions in excess of the additions in the tax years decrease the credit of both types of invested capital taxpayers and also average earnings taxpayers. * * * [S. Rept. No. 2679, 81st Cong., 2d sess., p. 11.]

There is no suggestion in these reports of an intent to limit the amount of capital reduction by prohibiting the use of the equity capital figures in an amount less than zero for the purposes of computing net capital reduction.

If equity capital may not be an amount less than zero, the daily capital reduction of Madison Avenue Corporation during the taxable years cannot be correctly computed. It is agreed that the daily capital reduction in this case is the amount by which the equity capital at December 31, 1949, exceeds the amount of equity capital at the beginning of each of the taxable years 1951 and 1952. If the amount of equity capital available to the corporation at the beginning of the taxable years is zero because assets are less than liabilities, the daily capital reduction figure will be the same as the equity capital amount at December 31, 1949. The bulk of the capital reduction which actually took place, i. e., the reduction of assets below liabilities, would not be reflected in the computation at all. Such a result is contrary to the theory of adding capital increases and subtracting capital reductions in computing the excess profits credit as Congress intended it to apply. We therefore hold that in determining Madison Avenue Corporation's excess profits credit for the taxable year 1951 and the 1952 period respondent did not err by using equity capital in a negative amount less than zero for the purpose of computing daily capital reduction for those years.

*Thomas Paper Stock Co.*, 22 T. C. 1294, relied on by petitioner, is distinguishable. The issue in that case involved *additions* to *base period capital* which are computed under section 435 (f) (2) by determining the yearly base period capital for each of the applicable base period years. The problem of computing daily capital reduction for the taxable year was not involved. Moreover, in the *Thomas* case the facts show that base period capital for all of the base period years was a minus figure. Thus, since section 435 (f) (1) provides that for the purpose of computing the excess profits tax credit base period capital shall not be an amount less than zero, no credit was allowed in that case for capital additions to minus amounts of base period capital. In computing the amount of *capital reduction during the taxable year*, however, it is not necessary to refer to the amount of base period capital. Section 435 (g) (4) contains a procedure for determining the amount of capital reduction during the taxable year which is quite different from that used in determining base period

capital additions and which does not contain any limitation similar to that found in section 435 (f) (1). Accordingly, the *Thomas Paper Stock Co.* case is not in conflict with our conclusion in this case that for the purpose of computing daily capital reduction the equity capital of Madison Avenue Corporation at the beginning of the taxable year 1951 and the 1952 period was an amount less than zero.

The second issue is whether the purchase and retirement by Madison Avenue Corporation of 4,725 shares of its own common stock for $1,500,000 was a distribution not out of earnings and profits for the purpose of computing daily capital reduction for the taxable year 1950 under section 435 (g) (4). The parties have stipulated that in computing Madison Avenue Corporation's excess profits tax credit for 1950, the cost of this stock has been treated as a distribution made during the taxable year for the purpose of determining distributions during the taxable year not out of earnings. Petitioner contends that the distribution of the $1,500,000 must be reduced by the 1950 corporate earnings allocable to the 4,725 shares retired and that the computation of distributions not out of earnings and profits must be limited to the amount of equity capital at the beginning of 1950. Respondent insists that none of this distribution was out of earnings and profits and that the capital of Madison Avenue Corporation was reduced by the entire amount of $1,500,000.

The first part of petitioner's argument is difficult to follow. In computing average daily distributions not out of profits of Madison Avenue Corporation for 1950, petitioner has divided the earnings for 1950 ($159,433.16) by the total number of shares outstanding (5,985) to determine the 1950 earnings per share, has multiplied the amount of earnings per share ($26.64) by the number of shares retired (4,725) and has subtracted this amount ($125,874) from the distribution of $1,500,000. Although no legal argument to support this computation has been advanced, petitioner appears to suggest that $125,874 of the $1,500,000 distribution was made out of earnings and profits rather than out of capital. The situation may therefore be analogized to that where the question is whether a stock redemption is essentially equivalent to a dividend. Sec. 115 (g), I. R. C. 1939; see 1 Mertens, Law of Federal Income Taxation, sec. 9.98 *et seq.*

If the distribution in this case was essentially equivalent to a dividend, it is arguable that at least part of the distribution was made out of earnings and profits for 1950. Sec. 115 (g). But petitioner has offered no evidence in support of its position. Although there is no general rule as to when a distribution in connection with a redemption of stock is essentially equivalent to the distribution of a taxable dividend, certain criteria have been developed by the courts including the following: The presence or absence of a real business purpose;

whether the action was initiated by the corporation or by the share-holders; the amount of earnings and profits available for the declaration of a regular dividend, and the corporation's past record with respect to the payment of dividends; whether the distribution resulted in any substantial change in ownership and control, or in a contraction of corporate operations; continued profitable operations; the effect of the distribution as compared with the declaration of a regular dividend; and any special circumstances existing at the time of the distribution. *Giles E. Bullock*, 26 T. C. 276; 1 Mertens, Law of Federal Income Taxation, sec. 9.100. No one factor is controlling and all relevant factors must be considered. *J. Paul McDaniel*, 25 T. C. 276. Here, we know only the amount of earnings and profits of Madison Avenue Corporation for the year 1950. From this scant information we cannot say that the distribution under consideration here was essentially equivalent to a taxable dividend and that therefore some portion of it was made out of earnings and profits for the year. Accordingly, respondent was correct in determining that the entire amount of $1,500,000 was a distribution not out of earnings and profits for 1950.

Petitioner's further contention that, for the purpose of computing daily capital reduction for 1950, the amount of distributions not out of earnings and profits is limited to the amount of equity capital at the beginning of the taxable year must also be rejected. Section 435 (g) (4) provides that one of the elements in computing the daily capital reduction is "(A) Distributions to shareholders previously made during such taxable year which are not out of earnings and profits of such taxable year." We find nothing in this language to suggest that the amount of any distribution not out of earnings and profits is limited to the amount of equity capital at the beginning of the taxable year. If a distribution is not made out of earnings, it is undoubtedly made out of capital which thereafter is no longer available to the corporation, regardless of the amount of equity capital in existence at the beginning of the taxable year, and the full amount of such distribution should be reflected in the daily capital reduction computation. The amount of equity capital has significance only under section 435 (g) (4) (B) for the purpose of determining the amount by which equity capital at the beginning of the taxpayer's first excess profits tax year exceeds equity capital at the beginning of the taxable year, as was pointed out in the discussion of the first issue. Accordingly, we hold that the amount of $1,500,000 paid by Madison Avenue Corporation in 1950 for the purchase and subsequent retirement of 4,725 shares of its stock was fully includible in daily capital reduction for the purpose of computing the excess profits credit of

Madison Avenue Corporation for that year. Cf. *Cleveland Graphite Bronze Co.*, 10 T. C. 974, 987 (1948), affd. (C. A. 6, 1949) 177 F. 2d 200.

The third issue is whether Madison Avenue Corporation is entitled to an adjustment in its base period net income for losses from the operation of a farm as a branch. In computing the excess profits credit under section 435 (a), it is necessary to determine the average base period net income. For the purpose of computing the average base period net income, the excess profits net income for any taxable year is the normal tax net income increased or decreased by certain specified adjustments. Sec. 433 (b), I. R. C. 1939. These adjustments permit a comparison between the base period experience and the income of the taxable year by requiring the removal of abnormalities both from the income of the taxable year and from the income of the base period. Among these adjustments is the one relating to base period losses from branch operations. Sec. 433 (b) (18) and (19), I. R. C. 1939. Under these sections, a corporation which operated a branch of its business at a loss during two or more taxable years of its base period is required to adjust for such loss by increasing its excess profits tax net income for each of such years in the amount by which such loss exceeds the loss, if any, incurred by the branch during the excess profits tax taxable year for which the tax is computed. The adjustment does not apply, however, unless the sum of the net losses of the branch during the base period exceeds 15 per cent of the aggregate excess profits net income of the taxpayer during the base period. If a branch had losses during the base period but no losses during the taxable year, the net effect of the adjustment would be to increase by the amount of the losses the taxpayer's excess profits net income for the base period years in which the losses occurred.

During the base period years Madison Avenue Corporation incurred certain losses from the operation of a farm as a branch. Since the farm was sold in November 1949, the last year of the base period, and there was no branch operation during the taxable years, petitioner is entitled to increase the excess profits tax net income for each year in the base period by the amount of the losses *if* the net losses exceed 15 per cent of the aggregate base period net income of Madison Avenue Corporation. Petitioner has added to the operating losses of the farm certain amounts representing allocations of supervisory expense, office salaries and expense, and an adjustment based upon an interest rate of 5 per cent on the amount invested in the farm by Madison Avenue Corporation. Petitioner contends that the total of these additional expenses plus the operating losses of the farm exceed 15 per cent of the aggregate base period net income of Madison Avenue Corporation and that the corporation is therefore entitled to an adjustment under section 433 (b) (18).

Although we have accepted petitioner's computation of operating farm loss as reflected in Madison Avenue Corporation's books and as adjusted by the revenue agent, we are unable to agree with petitioner's allocation of additional expense. Petitioner first claims that the sum of $500 per month for executive salary expense should be allocated to the farm operation for the number of months that the farm was operated during the base period years. This amount is approximately one-third of the annual salary of $18,000 paid to the executive of Madison Avenue Corporation who furnished all of the executive supervision that the farm received. Two other executives, who received salaries of $12,000 a year and $6,000 a year, did not supervise the farm at all. Petitioner offered no evidence to support this allocation other than the testimony of Madison Avenue Corporation's accountant that the allocation was based on "what was thought to be a reasonable allocation." The amount invested in the farm ranged from $65,990 in 1946 to $150,675.89 in 1949, whereas the amount invested by Madison Avenue Corporation in the Sterick Building and other depreciable assets was in 1950 approximately ten times the amount invested in the farm at the time the latter was sold. Since the record is silent as to the actual amount of time spent by the executive in supervising farm operations, we conclude that one-tenth of $18,000, or $1,800 annually, is a reasonable allocation for executive salary expense attributable to farm operation. Cf. *Cohan* v. *Commissioner*, 39 F. 2d 540.

Petitioner has allocated the sum of $150 per month as office salaries and expenses attributable to farm operations during the base period years. Again, however, petitioner has offered no evidence to support its estimates. Petitioner's witness testified that office salaries and expenses of Madison Avenue Corporation totaled approximately $300 per month for an office manager, $200 per month for a secretary, and an assistant manager's salary of $625 a month. The only work done by the office manager and the secretary in connection with farm operation was clerical work relating to the use of the farm and keeping the books of account for the farm. However, the books of account were not separate but were incorporated in the regular books of the corporation. Petitioner's witness was unable to recall anything done by the assistant manager in connection with the farm. In the absence of evidence as to the actual amount of time spent in performing clerical duties and keeping accounts relating to the farm we conclude that one-tenth of the monthly salaries of the office manager and the secretary were attributable to farm operations and we have allowed this amount in computing net farm losses for the base period years. Cf. *Cohan* v. *Commissioner, supra.*

The final item petitioner claims as an adjustment to farm losses is an interest expense in an amount equal to 5 per cent of the amount in-

vested by Madison Avenue Corporation in the farm for each of the base period years. Section 433 (b) (19), relating to rules for the application of paragraph (18), however, takes into account only that portion of the deductions *under section 23* which are determined to be properly allocable to the operation of the branch. Petitioner's allocation here is based on a theoretical rate of interest on the amount invested in the farm. There has been no showing that Madison Avenue Corporation incurred in its farm operations interest expense "paid or accrued within the taxable year on indebtedness." Sec. 23 (b), I. R. C. 1939. Accordingly, we hold that farm losses of Madison Avenue Corporation are not to be increased by any amount of "interest or investment in farm."

When "Farm Loss per Books and Returns" is adjusted by the correct amount of executive salaries and office expense allocable to farm operations and the elimination of the interest item mentioned above, it is apparent that no adjustment for base period losses from branch operations is allowable. Madison Avenue Corporation's total loss from farm operations during the base period years was $63,346.03. Adding this amount to the excess profits net income as determined by respondent results in an aggregate excess profits net income for the base period of $484,236.64. Since the farm loss is only 13 per cent of the aggregate excess profits net income, the base period net income of Madison Avenue Corporation is not to be increased by the amount of base period losses from branch operations. Sec. 433 (b) (18).

In its pleadings, petitioner alleged that Madison Avenue Corporation was entitled to adjustment of excess profits credit for the taxable years 1950 and 1951 for rents and certain other abnormal expenditures. Since petitioner submitted no proof in support of this contention, it has failed to carry its burden with respect to this issue, and respondent's determination in this regard is sustained.

*Decision will be entered for the respondent.*