CUMBERLAND PORTLAND CEMENT · COMPANY, PETITIONER, *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 56829.    Filed March 31, 1958.

*Christian M. Lauritzen, II, Esq., Austin M. Zimmerman, Esq.*, and
*Harold W. Norman, Esq.*, for the petitioner.
*David H. Nelson, Esq.*, for the respondent.

ATKINS, *Judge:* The respondent determined deficiencies in income
tax, declared value excess-profits tax, and excess profits tax for the
calendar year 1945 in the respective amounts of $3,919.75, $2,164.59,
and $24,909.12, and a deficiency in income tax for the calendar year
1946 in the amount of $23,450.62.

The issue as to depletion on limestone deposits has been removed
from our consideration by the respondent's concession on brief that
the petitioner is entitled to deductions as claimed in the returns, and
by the petitioner's failure to press a claim for any greater amount.
The only remaining issue relates to the unit rate to be used in com-
puting depreciation on its plant and equipment. The petitioner
contends that the doctrine of collateral estoppel precludes a reconsid-
eration of the unit rate, in view of the decision in *Cumberland Port-
land Cement Co.*, 44 B. T. A. 1170 (1941), which fixed such unit rate
for the years 1936 and 1937. Alternatively, the petitioner contends
that it is entitled to depreciation in a greater amount than claimed in
its returns.

### FINDINGS OF FACT.

Some of the facts were stipulated and the stipulations are incor-
porated herein by this reference. In addition the parties have
stipulated that the Court may take judicial notice of the record and
the facts of and opinion in the prior proceeding, reported in 44 B. T. A.
at page 1170.

The petitioner, a Delaware corporation, was incorporated in May
1926 and operated a cement plant at Cowan, Tennessee. Its Federal
tax returns for the years 1945 and 1946 were filed with the collector
of internal revenue for the district of Tennessee.

The petitioner throughout the years has engaged principally in the
production and sale of cement of various kinds, owning its own lime-
stone and clay deposits.

During the years 1945 and 1946 and for many years prior thereto the petitioner computed depreciation on its plant and equipment by a proper method, namely, the unit-of-production method, the unit being a barrel of clinker. Clinker is the mixture of limestone and clay which has been ground, mixed, and burned in the kiln, but before being made into the final Portland or other cement product by the use of additives and the final grinding.

In the earlier proceeding before the Board of Tax Appeals, tried in 1940, we held that the plant and equipment, which had originally cost $1,200,000, had a composite useful life of 22½ years from the date of commencement of operations in mid-1927. The conclusions we reached there resulted in a decision that 15.64 cents per barrel of clinker was a reasonable allowance for depreciation. This was based upon an average yearly production of clinker for the 12½-year period ending with 1939 of 341,027.44 barrels and upon the expectation that the average production of clinker would remain comparable throughout the remaining 10 years of anticipated life of the plant. The unit rate as found in our prior decision was used and allowed for all the years through 1944, and the petitioner used the same unit rate for the years in question, 1945 and 1946.

The plant had a rated capacity of 800,000 barrels of clinker per year. The yearly production, in barrels of clinker, from the commencement of operations in mid-1927 through 1946 was as follows:

| Year | Barrels of clinker produced | Year | Barrels of clinker produced |
|---|---|---|---|
| 1927 (½ year) | 187,561 | 1938 | 392,852 |
| 1928 | 475,935 | 1939 | 471,645 |
| 1929 | 551,439 | 1940 | 456,837 |
| 1930 | 413,412 | 1941 | 596,299 |
| 1931 | 226,486 | 1942 | 788,067 |
| 1932 | 128,038 | 1943 | 472,099 |
| 1933 | 129,399 | 1944 | 408,631 |
| 1934 | 352,433 | 1945 | 407,119 |
| 1935 | 223,031 | 1946 | 642,518 |
| 1936 | 330,257 | | |
| 1937 | 380,355 | Total | 8,034,413 |

From 1927 through 1939 the plant operated at approximately 40 per cent of rated capacity. From 1940 through 1946 it operated at about 67 per cent of capacity. The yearly average for the entire period from 1927 through 1946 was 412,021.18 barrels, or about 51 per cent of capacity.

The cement industry as a whole operated at a high percentage of capacity in 1941 and into 1942. At sometime in 1942 the demand for cement dropped due to the curtailment of home building and road construction. This is reflected in the petitioner's decreased production during the war years 1943 through 1945. During the years in question

the petitioner could reasonably anticipate that the volume of sales of cement in postwar years would be greater than they were during the war years, 1943 through 1945.

Due to the decline in the demand for cement the petitioner in 1944 and 1945 supplemented its business by the production of pebble lime which involved the conversion of one of its two kilns and additional expenditures for facilities for that purpose. The production of pebble lime entailed the quarrying, crushing, and burning of limestone. The material never went through a clinker stage as in the case of cement. Production of pebble lime ceased in October 1945. In its 1945 return the petitioner claimed no depreciation of its plant and equipment on account of the manufacture of pebble lime.

The original cost in 1927 of the depreciable portion of the petitioner's plant and equipment, and the basis for depreciation, was at least $1,200,000. From time to time, since 1927 and through the taxable years, the petitioner has made replacements, improvements, and additions to its depreciable properties. During the years 1940 to 1944, inclusive, the petitioner's directors authorized expenditures for new equipment and plant modernization as follows:

| Date of authorization | Amount |
| --- | --- |
| Dec. 2, 1940 | $144,000 |
| Sept. 23, 1941 | 60,000 |
| Jan. 19, 1942 | 80,000 |
| Jan. 18, 1943 | 40,000 |
| Jan. 17, 1944 | 54,000 |
| | 378,000 |

Pursuant to such authorizations, $247,973.25 was spent prior to the year 1943, $92,093.26 was spent in 1943, $18,556.41 in 1944, and $14,679.53 in 1945. At the close of 1945 there remained an unexpended balance of $4,697.55 of the total authorized amounts for new equipment and modernization. Such equipment and modernization facilities included replacement of railroad haulage equipment at the quarry and clay field; extension of crushed limestone storage space; a clay-mixing and storage tank with pumps and motors; a quenching clinker cooler with motors and other associated equipment; enlargement and repairs of finish mill building with continuous air filter, a rotary air compressor, motors, and associated equipment; four 30- by 70-foot cement storage bins with conveyors, screens, motors, and other necessary equipment; structures and equipment to produce chemical lime, including elevators, screen, belt conveyors, motors, and necessary equipment, and a 30- by 30-foot storage bin; 1,190 feet of railroad track; a transit-mix concrete mixer; and a clinker storage roof.

The net additions to plant and equipment, and the remaining unrecovered basis in the years 1937 to 1944, inclusive, were as follows:

| Year | Additions | Remaining basis at year end | Year | Additions | Remaining basis at year end |
|------|-----------|------------------------------|------|-----------|------------------------------|
| 1937 | $78,715.35 | $768,085.22 | 1941 | $63,182.21 | $631,286.15 |
| 1938 | 1,505.74 | 708,408.17 | 1942 | 79,551.29 | 591,931.41 |
| 1939 | 5,797.49 | 640,440.38 | 1943 | 87,553.26 | 606,708.39 |
| 1940 | 34,771.00 | 603,762.07 | 1944 | 18,556.41 | 561,354.91 |

In 1945 net plant additions amounted to $8,696.33. There were no net plant additions in 1946.

During the taxable years 1945 and 1946 some of the petitioner's equipment was not of the most modern type and some had been used since the plant was put into operation in 1927. Among the equipment which was not of a modern type were the grinding mill, slurry tank agitators, airlift slurry pumps, and its equipment for adding gypsum in the manufacture of cement. In addition, some of the corrugated metal siding on the plant buildings was in need of replacement. However, all such equipment was useful, and was used in the petitioner's business during the years in question. During the period from 1941 to 1946 cement companies generally had not been able to make normal additions, replacements, and improvements, because of wartime restrictions on obtaining materials.

During the years 1943 through 1946 the petitioner expended for supplies and repair parts the following amounts:

| | |
|---|---|
| 1943 | $42,931.28 |
| 1944 | 90,250.24 |
| 1945 | 107,261.26 |
| 1946 | 89,241.07 |

Due principally to the fact that the stockholders of the petitioner contemplated selling their stock, during the years 1945 and 1946 it was the policy of the petitioner's management to keep to a minimum the expenditures on maintenance, repairs, replacement, and modernization of the plant. However, sufficient was expended to keep the plant in operating condition.

Effective January 1, 1947, the assets of the petitioner were acquired by Marquette Cement Manufacturing Company, through a purchase of all the petitioner's stock at a cost of $1,950,000.

In an appraisal of the plant and equipment in question, made by an independent appraisal company for Marquette Cement Manufacturing Company in September 1947, as of January 1, 1947, the individual components of the plant were evaluated and a remaining useful life of each was fixed. Such report reflects a composite remaining useful life expectancy of the plant of about 16 years from January 1, 1947. In such report the total cost of $1,950,000 was allocated among the various assets, there being allocated to land $66,917 and to limestone and clay deposits $187,488.

In its returns for the years 1945 and 1946 the petitioner claimed depreciation in the respective amounts of $63,673.41 and $100,489.82, which was computed at 15.64 cents per barrel of clinker. In the notice of deficiency the respondent allowed the respective amounts of $28,163.43 and $44,447.73. The respondent determined that as of January 1, 1945, the plant had a remaining useful life of 20 years. In his computation the respondent determined that the anticipated production of clinker from January 1, 1945, through December 31, 1964, would be the yearly average experienced by the petitioner over the period from 1927 through 1946. This resulted in a unit rate of 6.81221 cents per clinker barrel which he used in computing the allowance for depreciation. In addition, he determined that for 1946 the petitioner was entitled to additional depreciation upon net capital additions made during the year 1945 computed at a rate of 0.10553 cents per clinker barrel of production.

As of January 1, 1945, the petitioner's plant and equipment had an expected composite remaining useful life of 10 years. For the remaining 8 years after 1946 it could be reasonably anticipated that the total production of clinker would equal eight times the average yearly production over the period from 1940 through 1946. Depreciation on the plant was sustained in the years 1945 and 1946 in an amount calculated by application of a rate per barrel of clinker which may be computed in accordance with these findings.

OPINION.

The parties are in agreement that the unit-of-production method of computing depreciation, which the petitioner had used for many years, including the years in question, is a proper method of computing depreciation on its plant and equipment. Nor is there any controversy as to the adjusted basis of the plant and equipment at January 1, 1945. However, the petitioner contends, first, that the doctrine of collateral estoppel or estoppel by judgment precludes a reconsideration of the depreciation issue, in view of the prior holding in *Cumberland Portland Cement Co.*, 44 B. T. A. 1170, in which, on recomputation, it was decided that a reasonable allowance for depreciation resulted from the application of an amount of 15.64 cents per barrel of clinker produced.

Section 23 (1) of the Internal Revenue Code of 1939, provides for the deduction of "[a] reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)" of property used in the trade or business. Thus, the annual deduction to be allowed includes not only exhaustion, wear, and tear, but also obsolescence, and, since none of the factors can be accurately measured, the

statute provides for a "reasonable" allowance.[1]  *V. Loewers Gambrinus Brewery Co.* v. *Anderson*, 282 U. S. 638.  The computation of the "reasonable" allowance calls for the best estimate, based upon all available information, of the projected useful life of the property.

Under the unit-of-production method the cost of plant and equipment is recovered by means of depreciation deductions, the deduction for a particular year being that portion of the cost which the number of units produced in that year bears to the total estimated production over the estimated useful life of the plant.  Obviously estimates of useful life of the plant and over-all production over such estimated life, although reasonable in the light of circumstances then existing, might later prove to be erroneous due to changed conditions or experience in the interim.

In *Commissioner* v. *Sunnen*, 333 U. S. 591, the Supreme Court recognized that in matters of Federal taxation each year is the origin of a new liability and of a separate cause of action and that "a subsequent modification of the significant facts * * * may make that determination obsolete or erroneous, at least for future purposes."  The Court there stated in part with regard to the doctrine of collateral estoppel:

That principle is designed to prevent repetitious lawsuits over matters which have once been decided and which have remained substantially static, factually and legally. * * *

\*    \*    \*    \*    \*    \*    \*

And so where two cases involve income taxes in different taxable years, collateral estoppel must be used with its limitations carefully in mind so as to avoid injustice. It must be confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where the controlling facts and applicable legal rules remain unchanged.  *Tait* v. *Western Md. R. Co., supra.* * * *

In the petitioner's former case (44 B. T. A. 1170) an estimated useful life of 22½ years from the middle of 1927, and an estimate of total production throughout such life, were based upon the taxpayer's experience and the facts known during its existence up to the trial in 1940.  In the instant case we have before us the additional experience

---

[1] Sec. 29.23(1)–1 of Regulations 111 provides in part:

For convenience such an allowance will usually be referred to as depreciation, excluding from the term any idea of a mere reduction in market value not resulting from exhaustion, wear and tear, or obsolescence. The proper allowance for such depreciation is that amount which should be set aside for the taxable year in accordance with a reasonably consistent plan (not necessarily at a uniform rate), whereby the aggregate of the amounts so set aside, plus the salvage value, will, at the end of the useful life of the depreciable property, equal the cost or other basis of the property determined in accordance with section 113. * * *

Sec. 29.23(1)–2 of Regulations 111 provides in part:

In the case of tangible property, it applies to that which is subject to wear and tear, to decay or decline from natural causes, to exhaustion, and to obsolescence due to the normal progress of the art, as where machinery or other property must be replaced by a new invention, or due to the inadequacy of the property to the growing needs of the business. * * *

and facts since that time. The evidence shows that there were significant changes in the facts and circumstances which could materially change the unit rate to be used in computing the allowance for depreciation. Such additional facts relate to the greatly increased rate of production of the petitioner, the anticipated postwar demand for cement, the effects of World War II, including the availability of materials, and the actual condition of the plant in the years in question. Under these circumstances, we think there were such substantial changes in the controlling facts as to render the doctrine of collateral estoppel inapplicable.

We turn then to a consideration of the question of the proper amounts allowable for depreciation for the years 1945 and 1946. The respondent held that as of January 1, 1945, the plant and equipment had a remaining useful life of 20 years. The petitioner contends that the useful life of the plant would expire at the end of 1949, in accordance with the finding of useful life in the prior decision, but now contends for a greater allowance of depreciation than claimed in the returns on the ground of obsolescence.

The petitioner called as a witness its former general manager, who testified that 15.64 cents per barrel of clinker resulted in inadequate depreciation for the years in question. He testified, in effect, that at the end of 1944 the plant was well worn and that if the plant had continued to operate without making any expenditures for replacement of obsolete and wornout equipment, by December 31, 1950, the plant would have been "just about a wreck," and that if the plant were to continue beyond that date it would have been necessary to spend a great deal of money. However, on cross-examination he conceded that the petitioner did in fact, in the years in question, operate successfully in competition with other cement manufacturers. We also note that in reports submitted to the president of the company for the years 1943 and 1944 by this witness, representations were made that improvements and replacements made in plant and equipment were such as to place the plant in modern condition and on a competitive basis with other producers in the area. We note also that in answer to a direct question he was unable to give an estimate of the remaining useful life of the plant as of January 1, 1945.

The fact is that the plant continued to operate effectively through 1946, reaching a production of 642,518 barrels of clinker (80 per cent of its rated capacity of 800,000 barrels per year). Furthermore, at the beginning of 1947 Marquette Cement Manufacturing Company acquired the properties of petitioner by a purchase of its stock for $1,950,000. That company had an independent appraisal made for the purpose of allocating the cost among the assets, and only about $250,000 was allocated to nondepreciable assets. Such appraisal re-

flected a composite remaining useful life of the plant of about 16 years from January 1, 1947. The appraiser who made the appraisal testified and corroborated the appraisal which had been made.

Based upon a consideration of the whole record, and upon the assumption of unchanged management policies, we have exercised our best judgment, and have concluded and found as a fact that as of January 1, 1945, the plant had an expected remaining useful life of 10 years. In reaching this conclusion we have taken into consideration the evidence indicating that some of the equipment was in the process of becoming obsolete. We have also taken into consideration the fact that during the years in question the petitioner was expending a minimum amount for maintenance and replacement, consistent with keeping the plant in adequate operating condition.

We have also concluded and found as a fact that the production of barrels of clinker which might reasonably be expected in the 8 years of remaining useful life after 1946, would equal eight times the average annual production over the period from 1940 through 1946. Such anticipated production, plus the actual production during the years 1945 and 1946, would represent the total expected production over the 10-year remaining useful life of the plant after January 1, 1945. The proper amount per barrel of clinker to be used in computing the depreciation allowance will be found by dividing the adjusted basis of the plant and equipment, as of January 1, 1945, by the total expected production over the 10-year remaining useful life. This amount applied to the actual production in the years in question will result in a reasonable allowance for depreciation. The actual amounts of depreciation will be reflected in the recomputation under Rule 50.

We have not overlooked the contention of the petitioner that it is entitled to some additional deduction on account of obsolescence of plant and equipment. As indicated above, we have taken into consideration, in fixing the remaining useful life of the plant, the factor of obsolescence. The petitioner does not contend for an additional obsolescence deduction on account of particular assets having become in fact obsolete within the taxable years. Insofar as the record shows, all the equipment was in use in the years in question.

The petitioner also contends, for the first time on brief, that it is entitled to additional depreciation for the year 1945 on account of the manufacture of pebble lime. In the first place, in its returns the petitioner did not make any such claim. In the pleadings, although an alternative claim was made for additional depreciation, the reason given is obsolescence, and no mention is made of additional depreciation on account of the production of pebble lime. Furthermore, the parties have stipulated that for purposes of this proceeding the proper method of computing depreciation is to be based upon the number of

barrels of clinker produced, which is not involved in the production of pebble lime. The petitioner did not affirmatively attempt to introduce any evidence upon this subject. In the record the only reference to the production of pebble lime occurs in the cross-examination, by counsel for the respondent, of one witness for the petitioner, and there was no intimation at the trial that this was an issue between the parties. Under the circumstances, the issue is not properly before us. Even if it were, the evidence of record would be inadequate to permit us to determine with any reasonable degree of accuracy how much additional depreciation might have been sustained due to the manufacture of this product. Under the circumstances, in the recomputation under Rule 50 no additional amount will be allowed as depreciation on account of the production of pebble lime.

*Decision will be entered under Rule 50.*