**MID-SOUTHERN FOUNDATION,**
Petitioner,

v.

**COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.**

No. 13435.

United States Court of Appeals
Sixth Circuit.

Dec. 13, 1958.

John R. Stivers, Memphis, Tenn., for petitioner.

David O. Walter, Dept. of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Harry Baum, Dept. of Justice, Washington, D. C., on the brief), for respondent.

Before MILLER, Circuit Judge, and JONES and THORNTON, District Judges.

SHACKELFORD MILLER, Jr., Circuit Judge.

The petitioner seeks a review of the decision of the Tax Court which held that the petitioner was liable for deficiencies in income taxes for the calendar years 1950 and 1951, and for the period January 1 to June 10, 1952, under the

provisions of the Excess Profits Tax Act of 1950 (Korean War Excess Profits Tax Act), Sections 430 to 472, Internal Revenue Code of 1939, 26 U.S.C.A. Excess Profits Taxes, §§ 430–472.

The facts, which were mostly stipulated, are set out in the findings of fact and opinion of the Tax Court, reported at 28 T.C. 918 to which reference is made. We will restate in this opinion only such basic facts as are necessary to present the issues involved in this review. The Madison Avenue Corporation, incorporated under the laws of Tennessee, had as its principal asset the Sterick Building in Memphis, Tennessee, and was engaged in the management and leasing of office space. It filed corporation income tax returns for the years 1950 and 1951 and for the period commencing January 1 and ending June 10, 1952, hereinafter referred to as the 1952 period. The petitioner, Mid-Southern Foundation, was incorporated on June 2, 1952, under the laws of Tennessee, providing for the organization of corporations for the general welfare and not for profit. It thereafter became the owner of all of Madison Avenue Corporation's capital stock. On June 10, 1952, all the assets of that corporation were transferred to and all of the liabilities of that corporation were assumed by the petitioner. Immediately thereafter the corporate charter of the Madison Avenue Corporation was surrendered. The deficiency assessments herein involved were against the Madison Avenue Corporation, which liabilities in the amounts of $8,176.74 for 1950, $21,160.18 for 1951, and $404.99 for the 1952 period, if sustained, are legal liabilities of the petitioner as its transferee. For the purposes of this opinion, the word "taxpayer" will be used without attempting to distinguish between the two corporations.

The applicable Korean War Excess Profits Tax statute is lengthy and complex. However, the following general principles embodied therein explain its general operation and lead to the solution of the present problem.

It was the purpose of Congress in enacting this tax to reach excessive corporate profits attributable to the Korean conflict. It selected for additional tax those corporations whose profits were higher than they probably would have been in the absence of hostilities and a large military budget. In doing so, it logically uses as a tax base a different taxable income than is used for the normal tax, in order to more clearly reflect the income attributable to the unusual, increased tempo of the economy.

After determining the normal-tax net income of the corporate taxpayer, certain adjustments are made thereto for determining the excess profits net income. These adjustments are stated in Sec. 433(a), Internal Revenue Code of 1939, and are numerous and detailed. They include such items as credit for dividends received, exclusion of gains or losses from the sale of capital assets, and an adjustment for interest on borrowed capital. Because of the adjustments, the amount of excess profits net income for any particular year may be greater than the normal-tax net income. Such was the result in this case, as is shown by the following table, about which there is no dispute:

|  | 1950 | 1951 | 1952 period |
|---|---|---|---|
| Normal-tax net income | $159,423.16 | $147,217.39 | ($ 391.95) loss |
| Excess profits tax net income | 175,896.79 | 179,953.57 | 12,415.53 |

From the excess profits net income is subtracted the taxpayer's excess profits credit, which results in the adjusted excess profits net income, upon which the excess profits tax is imposed. The present controversy involves the amount of the excess profits credit to which the taxpayer is entitled. It does not involve the amount of the excess profits net income, from which this credit is deducted.

Under Sec. 431 there is a minimum credit of $25,000.00. Under Sec. 434 a corporation may choose whichever of two methods of computing its credit will give it the greater amount. One method is based on the taxpayer's income during

the base period years 1946–1949, which method was used in this case. In general the average base period net income is determined by computing the excess profit net income for each month in the base period, eliminating the poorest consecutive twelve months, and dividing the aggregate of the other thirty-six months by three.

Sec. 435(a)(1), prior to amendment, provided that the excess profits credit for any taxable year should be the sum of 85 per cent of the average base period net income, plus adjustments for capital additions in the base period years, and minus 12 per cent of the net capital reduction, as defined in Sec. 435(g)(2), for the taxable year. It will be noticed that the first item, the average base period net income, is based upon occurrences during the base period years, and represents an amount that is constant during the taxable year; the second item, being the inclusion of a percentage of the amount of base period capital additions, also represents an amount reflecting past occurrences, which remains constant during the taxable year; while the third item provides for increasing or decreasing the credit to reflect events occurring during the taxable year itself, specifically, the change in the amount of capital held for the purposes of the business. It is this third item which is in dispute in this case.

Under Sec. 435(g)(2) and (4), the net capital reduction, being the third item above referred to, is arrived at by computing a daily capital reduction, which in turn involves "The amount, if any, by which the amount of the equity capital (as defined in section 437(c)) at the beginning of the taxpayer's first taxable year under this subchapter exceeds the amount of the equity capital at the beginning of the taxable year; * * *." This brings us to a consideration of "equity capital," which is defined in Sec. 437(c) as, "The equity capital of the taxpayer as of any time shall be the total of its assets held at such time in good faith for the purposes of the business, *reduced* by the total of its liabilities at such time." (Emphasis added.) The proper construction of the word "reduced" is the controlling factor in the present controversy, in so far as the year 1951 and the 1952 period are concerned. With respect to the taxable year 1950, that year was also the taxpayer's first taxable year under the excess profits tax, with the result that the equity capital at the beginning of the first taxable year under the excess profits tax was the same as the equity capital at the beginning of the taxable year 1950. Accordingly, there was no excess of the former over the latter, making Sec. 435(g)(4) inapplicable. The year 1950 involves a different problem to which we will refer later.

The taxpayer and the Commissioner disagree with respect to the meaning and effect of the foregoing definition of equity capital. The taxpayer contends that under the foregoing definition when its liabilities exceed its assets, then equity capital ceased to exist, with the result that its equity capital was zero. It contends that its assets can under no circumstances be "reduced" below zero; that although they may be completely wiped out by liabilities in a larger amount, they are not "reduced" to a minus figure. The Commissioner contends that when liabilities exceed assets, there is created a negative equity capital, instead of a zero equity capital, being the excess of the liabilities over the assets.

Applying these contentions to the facts of the present case, we have the following situation. At the beginning of the taxable years 1950 and 1951 and the taxable period of 1952, total assets and total liabilities of the taxpayer for the purpose of computing the excess profits tax credit were in the following amounts:

|  | 1950 | 1951 | 1952 |
|---|---|---|---|
| Total assets | $1,360,950.19 | $1,377,115.65 | $ 981,092.56 |
| Total liabilities | 1,143,421.14 | 2,572,500.55 | 2,123,406.73 |

It will thus be seen that at the beginning of the taxable year 1950 the total

assets exceeded the total liabilities by $217,529.05, but that at the beginning of the taxable year 1951 and the 1952 period, total liabilities exceeded total assets by the respective amounts of $1,195,384.-90 and $1,142,314.17. Under these figures the taxpayer contends there is an equity capital of $217,529.05 for the year 1950 and a zero equity capital for the year 1951 and the 1952 period. Under the Commissioner's contention, there would be an equity capital of $217,529.-05 for 1950 and a minus equity capital of $1,195,384.90 for 1951 and a minus equity capital of $1,142,314.17 for the 1952 period.

■ The foregoing analysis of the statute shows that the only variable factor of the three factors used in determining the excess profits credit is the third one which deals with changes *during the taxable year* in the amount of capital held for the purposes of the business. The excess profits credit increases if the capital devoted to the business increases; it decreases if that capital decreases. It appears to us to logically follow that in order to correctly reflect the actual change in this capital during each taxable year, it is necessary to subtract at the start of each year the total liabilities from the total assets, and if this results in a minus figure to use such minus figure for the purpose of showing the total change. Specifically applied to the present case, we see that the taxpayer's assets on January 1, 1950, exceeded its liabilities by $217,529.05. On January 1, 1951, its liabilities exceeded its assets by $1,195,384.90. There was an actual reduction in equity capital of $1,412,-913.95. Yet, if we accept the taxpayer's contention of not using a minus equity capital, there is only a reduction of $217,-529.05. There was also a further change as of January 1, 1952, which would be correctly reflected, in so far as actualities are concerned, by using the minus figure, although no change at all would be reflected, contrary to the actualities, if we adopted the taxpayer's contention. We think the Commissioner's construction of

the statute carries out its basic purpose of making changes in the excess profits credit so as to reflect actual changes in the equity capital from year to year. Vol. 7A, Merten's Law of Federal Income Taxation, p. 460, note 43.

■ In reaching this conclusion we have in mind that we are not compiling a balance sheet to show the net worth of the company, in which, obviously, assets become extinguished or merely zero when exceeded by liabilities. The formula provided by the statute disregards in several ways boths assets and liabilities and is not intended to reflect the net worth of the taxpayer. It is an arbitrary rule for computing a tax credit, and as such must be followed, although differing in some respects from the form and purpose of the ordinary corporate financial statement. La Belle Iron Works v. United States, 256 U.S. 377, 41 S.Ct. 528, 65 L.Ed. 998.

Taxpayer's contention that the word "reduced" in Sec. 437(c) should be construed as limiting the reduction to zero is, we believe, effectively met by a consideration of another section of the same statute. In Sec. 435(f) (1), dealing with capital additions in base period and defining yearly base period capital it provides that it shall be the sum of two amounts, "reduced (but not below zero) by the sum of * * *." The addition of the words "(but not below zero)" was made by an amendment of October 20, 1951, and shows that Congress knew how to limit a reduction to zero when it wished to do so. If it was the intent of Congress to limit the reduction of equity capital by Sec. 437(c) to zero it could readily have done so by using the same language.

■ Taxpayer uses what on first consideration appears to be a persuasive argument in favor of its position in contending that Congress never intended, in enacting an excess profits tax, to impose an excess profits tax on a taxpayer who was not subject in the particular tax year involved to even the normal income tax.

This was taxpayer's situation for the 1952 period, where for normal income tax purposes it had a loss of $391.95, yet was being assessed in the amount of $404.99 under the excess profits tax statute. But the argument loses its force when more carefully considered. In the first place, it is applicable only to the 1952 period. For the years 1950 and 1951 taxpayer had a substantial net income for normal tax purposes of $159,-423.16 and $147,217.39, respectively. In the second place, it is not directed to the question in issue. The reason the taxpayer had an excess profits tax although it did not have a normal tax was because it had an excess profits net income, although it did not have a normal-tax net income. This, in turn, was because of the different ways in which the two incomes were computed, the normal-tax income being adjusted under Sec. 433(a) by a number of factors in order to determine the excess profits net income. There can thus legally and logically be a substantial excess profits net income although there is not a normal-tax net income. The taxpayer does not complain of this section of the statute and the effect thereof is not an issue in the case. The taxpayer's complaint is with the construction of Sec. 437(c) which defines equity capital for the purpose of computing the excess profits credit. But it is the computation of the excess profits net income, before the credit is deducted from it, which is the real cause of the alleged unrealistic result it objects to. Keeping in mind the different tax philosophies which are responsible for the different methods of computing normal-tax net income and excess profits net income, we are of the opinion that the apparent unrealistic result is not actually unrealistic, but that it properly reflects the kind and amount of income, resulting from the unusual, increased tempo of the economy, which Congress intended to subject to a special tax, regardless of tax liability under normal conditions.

The taxpayer relies strongly upon Thomas Paper Stock Co. v. Commissioner, 22 T.C. 1294. As pointed out in the Tax Court's opinion in the present case, the issue in that case involved additions to *base period* capital which are computed under Sec. 435(f) (2), while the present case involves the amount of capital reduction during the *taxable year*, which is computed under Sec. 435(g) (4). For the reasons given by the Tax Court, we agree with its conclusion that the ruling in the Thomas Paper Stock Co. case is not in conflict with its later ruling in this case. If the two Tax Court decisions are in conflict, we are of the opinion for the reasons hereinabove given that the later ruling is the correct one. Louisville Property Co. v. Commissioner, 6 Cir., 140 F.2d 547, 549–550, certiorari denied 322 U.S. 755, 64 S.Ct. 1268, 88 L.Ed. 1584.

We turn now to the year 1950, which involves another problem. On June 7, 1950, the taxpayer acquired and retired 4,725 shares of its own common stock, for which it paid $1,500,000.00. In computing the excess profits credit under Sec. 435, subsection (g) (4) (A) thereof provides that one of the elements to be used in computing the daily capital reduction is "Distributions to shareholders previously made during such taxable year which are not out of the earnings and profits of such taxable year; * *." It is stipulated that in computing the excess profits credit for the year 1950, the cost of this stock is treated as a distribution made during the taxable year. The Commissioner held that the entire amount should be treated as a distribution not out of earnings and profits for the taxable year. Accordingly, it was included in computing the daily capital reduction, resulting in a smaller excess profits credit. The taxpayer contended (1) that the distribution of the $1,500,-000.00 must be reduced by the 1950 corporate earnings allocable to the 4,725 shares retired, and (2) that the computations of distributions not out of earnings and profits must be limited to the

amount of equity capital at the beginning of 1950. The Tax Court sustained the Commissioner. In rejecting taxpayer's contentions, it stated that its first contention was difficult to follow and could not be sustained on the evidence before it, and that with respect to its second contention, it found nothing in the language of Sec. 435(g) (4) (A) to suggest that the amount of any distribution not out of earnings and profits was limited to the amount of equity capital at the beginning of the taxable year.

■ Taxpayer's brief on this review, outside of a brief factual statement presenting the issue, devotes only one sentence to a discussion of this question, in which no reference is made to its first contention. We consider that contention to have been abandoned. N. L. R. B. v. Kentucky Utilities Co., 6 Cir., 182 F.2d 810, 814. In support of its second contention it merely states that its argument against using a minus equity capital for the year 1951 and the 1952 period is equally applicable to the question of distributions to shareholders not out of earnings and profits during the taxable year 1950. Having hereinabove rejected that argument, we believe further discussion is unnecessary. We concur in the views expressed by the Tax Court on this phase of the case.

The decision of the Tax Court is affirmed.

JONES, District Judge (dissenting).

I regret that I cannot join in the opinion of the majority of the court. It is my judgment that the case should be reversed for the reason, as I think, that the Commissioner, and the Tax Court affirming, misinterpreted Section 437(c) and because I am of opinion that Section 437(c) does not permit reduction of equity capital below zero. And, further, that the Commissioner's and the Tax Court's distinction between the present case and the Thomas Paper Stock case, 22 T.C. 1294, is not valid.