WRIGHT CONTRACTING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 69144.   Filed June 30, 1961.

---

*Scott P. Crampton, Esq., J. Q. Davidson, Esq.,* and *Tom B. Slade, Esq.,* for the petitioner.

*George W. Calvert, Esq.,* for the respondent.

622

628

OPINION.

KERN, *Judge:* The first issue presents the question of whether the amounts withheld from petitioner as a retained percentage of its earnings for work performed on long-term construction contracts should be included in petitioner's income in the years the work was performed, pursuant to the consistent and long-established system or practice of petitioner's accounting and reporting of such earnings and as determined by respondent, or whether the inclusion of such retainage in income should be deferred to subsequent years upon the final completion and acceptance of the work, even though this change was made by petitioner in its system or practice of accounting for such earnings subsequent to the last taxable year and the Commissioner has never been asked for his consent to such change pursuant to the pertinent regulations.

The applicable statutory provisions are sections 41 and 42 of the Internal Revenue Code of 1939.[1]   Section 41 provides that the net income shall be computed upon the basis of the taxpayer's annual accounting period "in accordance with the method of accounting regularly employed in keeping the books of such taxpayer" but if that method does not clearly reflect the income then "the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income."   Section 42 provides that all items of gross income shall be included in income under the method of accounting permitted under section 41.   The statute invests the Commissioner with broad administrative discretion to determine the question of the method of accounting which does clearly reflect the income, and the well-established rule is that the courts may not overturn the Commissioner's determination of that question unless the evidence clearly shows an abuse of his discretion.   *Schram* v. *United States*, 118 F. 2d 541; *Advertisers Exchange, Inc.*, 25 T.C. 1086, affirmed per curiam 240 F. 2d 958.

Section 39.41–2(c) of Regulations 118, the pertinent portions of which are set out in the margin,[2] requires that a taxpayer who changes the method of accounting employed in keeping his books shall, before computing his income upon such new method for purposes of taxation, secure the consent of the Commissioner.   The regulation requires the timely filing of an application for permission to change accompanied by a statement specifying the classes of items which would be treated differently as a result of the proposed change, and further states that permission to change the method of accounting will not be granted unless the taxpayer and the Commissioner agree to the terms and conditions under which the proposed change will be effected.

---

[1] SEC. 41. GENERAL RULE.

The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income. * * *

SEC. 42. PERIOD IN WHICH ITEMS OF GROSS INCOME INCLUDED.

(a) GENERAL RULE.—The amount of all items of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under methods of accounting permitted under section 41, any such amounts are to be properly accounted for as of a different period. * * *

[2] Regulations 118.

Sec. 39.41–2 *Bases of computation and changes in accounting methods.*

(c) A taxpayer who changes the method of accounting employed in keeping his books shall, before computing his income upon such new method for purposes of taxation, secure the consent of the Commissioner. * * * Application for permission to change the method of accounting employed and the basis upon which the return is made shall be filed within 90 days after the beginning of the taxable year to be covered by the return.   The application shall be accompanied by a statement specifying the classes of items differently treated under the two methods and specifying all amounts which would be duplicated or entirely omitted as a result of the proposed change.   Permission to change the method of accounting will not be granted unless the taxpayer and the Commissioner agree to the terms and conditions under which the change will be effected. * * *

One of the obvious reasons for this regulation is to prevent distortions of income which might result in an adverse effect upon the revenues. The cited regulation has the purpose of requiring consistency in the method of accounting for tax purposes and the courts have long approved the respondent's refusal to permit a change in a taxpayer's consistently used method of accounting without his prior consent. See *Michael Drazen*, 34 T.C. 1070, and the numerous authorities cited therein.

At all times material herein the petitioner has been engaged in the general contracting business and has maintained its books and records on the accrual basis of accounting. Under its long-term construction contracts and at specified times as the work progressed the petitioner had earnings for the work actually done and received the approved progress payments less a retained percentage which was withheld until the final completion and acceptance of the entire work covered by the contract. Under the method of accounting regularly employed by petitioner in keeping its books prior to and throughout the taxable years involved herein the petitioner accrued the amounts retained from earnings on long-term contracts as income in the year the work was performed. It treated the retained amounts as accounts receivable at their face value and subsequently charged off any portion thereof it failed to collect. The petitioner deducted its overhead expenses and direct expenses in connection with its long-term contracts as such expenses accrued. Prior to and during the taxable years petitioner's books were audited annually by a firm of certified public accountants which prepared its tax returns.

On its Federal tax returns from incorporation in 1942 through its fiscal year ended June 30, 1953, the petitioner consistently reported amounts retained from earnings on long-term contracts as income in the year the work was performed, which was in accordance with the method of accounting regularly employed in keeping its books. In the statutory notice of deficiency with respect to the fiscal years ended June 30, 1951, 1952, and 1953, the respondent accepted the petitioner's returns as correctly reporting as income the retainage on work done in each of those years.

On its tax return for the fiscal year ended June 30, 1954, contrary to the regular method of keeping its books throughout that year and without permission from respondent to change its method of reporting income, the petitioner did not include in income the amounts of retainage withheld from its earnings on long-term construction contracts for work performed during that taxable year. In his notice of deficiency, with respect to the fiscal year ended June 30, 1954, respondent included in gross income the increased amount of retainage due petitioner at the end of the year over the retainage at the beginning of the year. Further, the respondent determined that such

retainage was properly includible in the income of petitioner on the accrual basis and that petitioner should continue to use the method of reporting income which it had consistently used for all prior years in accordance with the method regularly employed in keeping its books.

The respondent contends that his determination on the first issue should be sustained for the reasons that petitioner's income for all of the taxable years has been computed, in the deficiency notice, in accordance with the method of accounting regularly employed by petitioner in keeping its books as required by section 41, *supra*, and that petitioner failed to obtain permission to change its method of accounting in computing its income for tax purposes as required by section 39.41–2(c) of Regulations 118, *supra*. Respondent further contends that petitioner's method of accounting consistently used in keeping its books over a long period of years clearly reflects its income for tax purposes, whereas the proposed changes in the return for the fiscal year 1954 and now sought retroactively for the prior fiscal years 1951, 1952, and 1953, would result in a distortion of taxable income for each of those years unless appropriate adjustments are made with respect to items which would be duplicated or entirely omitted because of the proposed change.

The petitioner contends that the provision of the above-cited regulation, prohibiting a change in a taxpayer's method of accounting without prior consent, is not applicable because here there is no question of petitioner making any change from its accrual basis of accounting, but only the question of correcting an alleged erroneous accrual of the withheld retainage as income in each of the taxable years. Petitioner argues that its right to such retainage did not become fixed until the final completion and acceptance of the work in subsequent years at which time it would become properly accruable as income, citing *Charles F. Dally*, 20 T.C. 894, affirmed on other issues 227 F. 2d 724, certiorari denied 351 U.S. 908, and *United States* v. *Harmon*, 205 F. 2d 919.

In this case, unlike the cases cited by petitioner, the taxpayer had *consistently* followed a long-established system or practice of accounting on its books and reporting for taxation (except for the last taxable year) the so-called retainage, which, when followed, adequately and accurately reflected its income, and the taxpayer itself made a change in this system or practice with regard to reporting such earnings for the last taxable year,[3] which had substantial adverse effects upon the revenues and made such change without the prior consent of the Commissioner.

---

[3] As to this last taxable year it should be noted that the earnings represented by such retainages were reported for taxation according to one concept of accounting and yet were carried on its books on another.

The question here is not whether the change would be proper. We may grant the propriety of the change (necessarily requiring considerable adjustments not made by the petitioner).[4] However, this question, in our opinion, would only be pertinent for our consideration here if it were raised before us *after* a request by petitioner for such change had been refused by the Commissioner.

The precise question for our determination on this issue is whether the change here involved is one which is subject to the provisions of section 39.41–2(c) of Regulations 118. Here the change was much more substantial and had a much more adverse effect on the revenues than the change involved in *Advertisers Enchange, Inc., supra.* On the authority of that case, we hold that the change in petitioner's system or practice of accounting and reporting the so-called retainages here involved and so consistently followed for so many years was so substantial with such adverse effects upon the revenues as to constitute a change in the method of accounting employed by petitioner within the meaning of the cited regulation and thus may not be made without first applying to the Commissioner for his permission. See *Commissioner* v. *O. Liquidating Corporation,* 292 F. 2d 225.

Having decided the first issue in favor of respondent, the respondent's alternative contentions become moot.

The next issue for consideration is whether the respondent erroneously reduced, by a determined salvage value, the depreciation deduction claimed by petitioner for each of the taxable years on its various types of equipment based on rates which were previously agreed upon by the parties with respect to prior taxable years.

The record discloses that the parties herein engaged in a long drawn-out dispute regarding depreciation allowances for years prior to the taxable years in question and that such depreciation dispute, along with other questions involved, was settled on a basis on which petitioner's tax liabilities for the fiscal years ended June 30, 1943 through 1950, were closed. Petitioner cites Revenue Rulings 90 and 91, 1953–1 C.B. 43–44, which announced a "policy" of the Internal Revenue Service generally not to disturb claimed depreciation deductions unless there was a clear and convincing basis for a change and such policy was pronounced for the purpose of reducing controversies. Petitioner contends that respondent should be required to follow his policy pronouncement in the absence of any clear and convincing basis for again revising the petitioner's depreciation schedules. Further, the petitioner contends that in the settlement for the prior years the parties agreed to depreciation rates which in effect resulted in an alleged "built-in" salvage value. However that may be, the short answer to petitioner's contention is that even a determination of

---

[4] But cf. *Dingle-Clark Co.,* 26 T.C. 782.

the allowance of a deduction in prior years, much less the pronouncement of a general policy, does not preclude the respondent's disallowance of a claimed similar deduction for subsequent years. *Cumberland Portland Cement Co.*, 29 T.C. 1185, and *Michel M. Segal*, 36 T.C. 148.

In our opinion the facts herein warrant a revision of petitioner's depreciation schedules in determining reasonable allowances under section 23(1) (1) of the Internal Revenue Code of 1939, which may be deducted in petitioner's returns for the taxable years. See *Massey Motors* v. *United States*, 364 U.S. 92, and *Hertz Corp.* v. *United States*, 364 U.S. 122.

Petitioner further contends that, if the Court reaches such a conclusion, then the respondent's determination of a flat 15-percent salvage value applied to automobiles, trucks, and other equipment is excessive. With this contention we agree and on the record herein conclude (and have so found as a fact) that the fair and reasonable salvage values are 10 percent of the basis for petitioner's automobiles and trucks, and 5 percent of the basis for petitioner's other equipment. Appropriate adjustments will be made in the computation under Rule 50.

We will next consider the question, for the purpose of computing petitioner's excess profits credit for each of the years involved, whether the respondent erroneously failed to allow petitioner the benefits of section 433(b) (18) and (19) of the Internal Revenue Code of 1939, as amended,[5] for alleged branch operation losses sustained during petitioner's base period.

---

[5] SEC. 433. EXCESS PROFITS NET INCOME.

(b) TAXABLE YEARS IN BASE PERIOD.—For the purposes of computing the average base period net income, the excess profits net income for any taxable year shall be the normal-tax net income, as defined in section 13(a)(2) as in effect for such taxable year, increased or decreased by the following adjustments * * * :

* * * * * * *

(18) ADJUSTMENT FOR BASE PERIOD LOSSES FROM BRANCH OPERATIONS.—In the case of a taxpayer which during two or more such taxable years operated a branch at a loss, the excess profits net income for each such taxable year (determined without regard to this paragraph) shall be increased by the amount of the excess of such loss above the loss, if any, incurred by such branch during the taxable year for which the tax under this subchapter is being computed. As used in this paragraph, the term "branch" means a unit or subdivision of the taxpayer's business which was operated in a separate place from its other business and differed substantially from its other business with respect to character of products or services. A unit or subdivision of the taxpayer's business shall not be considered to differ substantially from the taxpayer's other business unless it is of a type classifiable by the Standard Industrial Classification Manual in a different major industry group or in a different subgroup of the taxpayer's major industry group than that in which its other business is so classifiable; *Provided, however,* That this paragraph shall not apply unless the sum of the net losses of such branch during the base period exceeded 15 per centum of the aggregate excess profits net income of the taxpayer during the base period. For the purposes of this paragraph, the aggregate excess profits net income of the taxpayer during the base period shall be the sum of its excess profits net income for all years in the base period, increased by the sum of the net losses of such branch during the base period.

(19) RULES FOR APPLICATION OF PARAGRAPH (18).—For the purposes of paragraph (18)—

(A) A branch shall be deemed to have been operated at a loss during a taxable

In computing the excess profits credit provided for by section 435-(a) of the 1939 Code it is necessary to determine the average base period net income. Section 433(b), *supra*, provides that for the purpose of computing the average base period net income the excess profits net income for any taxable year shall be the normal tax net income increased or decreased by certain specified adjustments. These adjustments permit an appropriate comparison between the taxpayer's base period experience and its income for the taxable years by requiring the removal of certain abnormalities. Included among these adjustments is the one provided for by section 433(b) (18) and (19), *supra*, relating to base period losses from branch operations, provided all of the therein enumerated prerequisites are met. *Mid-Southern Foundation*, 28 T.C. 918, 931, affirmed on other issues 262 F. 2d 134, certiorari denied 359 U.S. 991, and *Kimble Glass Co.*, 35 T.C. 1238.

In the instant case the petitioner contends that the factual circumstances herein meet all of the statutory prerequisites while respondent contends that they fail to do so in several respects. In considering the evidentiary facts bearing upon this issue and the conclusions to be drawn therefrom, we take note of what was said in *Burford-Toothaker Tractor Co.* v. *United States*, 262 F. 2d 891, involving other sections of the Korean War Excess Profits Tax Act, but equally applicable here. In reversing 158 F. Supp. 429 the Court of Appeals for the Fifth Circuit, in effect, held that the trial court overemphasized single facts in unrealistic disregard of the practical nature of the operations involved and was, therefore, too narrow in its factual conclusions in relation to the intent of the statute, and stated in part:

This approach [by the District Court] is both highly unrealistic in the frame of this record and is an impermissible inoculation of the administrative process with the metaphysical subjective imponderables in Old Section 722 which Congress rejected as unworkable and unfair when, for the Korean Excess Profits Tax Bill, an automatic objective formula was prescribed. * * *

\* \* \* \* \* \* \*

Congress did not mean to write into this objective formula any legal casuistry. It was dealing with the very practical matter of taxes in practical day-to-day business operations. * * *

In *Halpin* v. *Collis Company*, 243 F. 2d 698 (affirming in part and reversing in part the judgment of the United States District Court, Southern District Iowa, Aug. 6, 1956), one of the issues in-

year if the portion of the deductions under section 23 for such year which is determined, under regulations prescribed by the Secretary, to be the portion thereof properly allocable to the operation of such branch exceeds the portion of the gross income during the taxable year which is determined under such regulations to be the portion thereof properly allocable to the operation of such branch; and the amount of the loss shall be an amount equal to such excess.

(B) If the portion of the gross income determined to be properly allocable to the operation of the branch is a minus quantity, the amount of such excess shall be the sum of the deductions under section 23 determined to be properly allocable to the operation of the branch plus an amount equal to such minus quantity.

volved the question of whether the taxpayer's camera unit or division was a "branch" as defined by section 433(b) (18), *supra*, and on appeal the issue boiled down to whether the camera unit was operated in a "separate place" from the taxpayer's other business. The camera unit was located on the premises of the main plant 600 feet from the general offices and in a building which had been partitioned off from the rest of the plant. The camera unit had its own separate entrance, facilities, machinery, employees, office, and records. The court said that there was nothing either in the statute or Regulations 130, section 40–433(b)–4, which requires that a branch be separated from the main plant by a substantial geographical distance and that the issue of whether the camera unit was operated at a "separate place" from the taxpayer's other business is a question of fact. Upon a consideration of all the evidence the court sustained the trial court's finding that "the camera unit was operated at a separate place and was physically separated from all of the taxpayer's other manufacturing facilities," and also sustained its conclusion that the camera unit was a "branch" within the meaning of section 433(b) (18) and (19), *supra*.

In the instant case the respondent states that his position on this issue is twofold—first, that section 433(b) (18), *supra*, was not meant to cover joint venture operations such as the Jones-Wright Company, but, if so, then second, that the Jones-Wright joint venture operation was not a "branch" within the meaning of that section because it fails to meet all of the statutory requirements.

In regard to his first position respondent contends that "Congress meant to cover *only* those branch operations which were 100 per cent owned by one corporation and did not mean to cover partnerships and joint ventures carried on by two or more corporations." However, there is nothing either in the statute or the Regulations 130, as amended by T.D. 6076 by adding section 40.433(b)–4, which requires that a branch operation be wholly owned by the taxpayer and the issue presents a question of fact as to whether the Jones-Wright joint venture of constructing the Wolf Creek Dam project, to the extent of petitioner's participation therein, constituted a "unit or subdivision" of the petitioner's business. Cf. *Halpin* v. *Collis Company*, *supra*. The petitioner owned a one-third proprietary interest and was an active participant in the entire dam construction project. As a practical business operation its one-third share of the losses from that construction project was just as much a loss to it as if it had been a sole owner. From a practical point of view it is immaterial and, in our opinion, in no way inconsistent with the intent of the statute that petitioner's proprietary interest in the operation was less than 100 percent. We conclude, and so hold, that to the extent of petitioner's proprietary interest therein the

Wolf Creek Dam project constituted a "unit or subdivision of the taxpayer's business" within the meaning of the term "branch" as defined in section 433 (b) (18), *supra*.

In regard to the question raised by respondent as to the lack of "permanency" of an operation to build one dam and then cease, the facts show that petitioner was a member of a joint venture which was awarded a contract for construction work of considerable magnitude, and in connection with that operation petitioner sustained substantial losses in each of the fiscal years ended June 30, 1946 to 1951, inclusive. This meets the terms of the statute which require only 2 or more years of operation of a unit or subdivision as a branch at a loss during the base period years.

In regard to the question raised by respondent as to whether the dam construction project was operated in a "separate place" from petitioner's other business, the facts clearly show that the operation had its own separate office and place of business, its own separate books and records, its own separate and locally hired employees, its own separate machinery and equipment of special types for the work to be done and, further, the project was physically and geographically separated from the petitioner's other primary business operations. This factual situation meets the statutory requirement. Cf. *Halpin* v. *Collis Company*, *supra*.

The next question raised by respondent is whether the dam operation "differed substantially" from petitioner's other business with respect to character of products or services. The facts show that the Wolf Creek Dam construction project is "of a type classifiable by the Standard Industrial Classification Manual * * * in a different subgroup of the taxpayer's major industry group than that in which its other business is so classifiable." Further, the facts clearly show that the Wolf Creek Dam project was an entirely new and different undertaking in the experience of petitioner and that the heavy construction of the dam, from foundation work to completed structure, differed substantially in material aspects of design, execution, and finished product from the petitioner's principal business of light construction of highways, streets, sewerlines, and airports. The factual circumstances herein meet this particular statutory requirement.

There is no question herein that the sum of petitioner's share of the net losses of the Wolf Creek Dam operation during the base period exceeded 15 percent of the aggregate excess profits net income of the petitioner during the base period.

Upon consideration of all the evidence herein, in relation to the terms of the cited statutory provisions and in the light of the cited cases, we conclude that the Wolf Creek Dam project, to the extent of petitioner's proprietary interest therein, was a "branch" operated

by petitioner within the meaning of section 433(b) (18) and (19), *supra*, and that its base period net income should be adjusted on account of its losses incurred in such branch operation.

The above conclusion obviates the necessity of passing upon the alternative issue of whether petitioner is entitled to the benefit of its industry rate of return under section 442(d) of the 1939 Code and the further question of what constitutes petitioner's total assets for the purpose of such computation.

The question of the petitioner's unused excess profits credit carryback, if any, from the fiscal year ended June 30, 1954, will be determined in the recomputation under Rule 50.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

Bruce, *J.*, concurs in the result.